FILED

# UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF VIRGINIA
## Richmond Division

2014 JUN 16 P 4: 39

DISTRICT COURT
VIRGINIA

| | |
|---|---|
| DOROTHY WENZEL on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>GLADE M. KNIGHT, MICHAEL S. WATERS, ROBERT M. WILY, JAMES C. BARDEN, JUSTIN KNIGHT, DAVID McKENNEY, KRISTIAN GATHRIGHT, BRYAN PEERY, KENT COLTON, GLENN W. BUNTING, LISA B. KERN, APPLE SEVEN ADVISORS, INC., APPLE EIGHT ADVISORS, INC. and APPLE FUND MANAGEMENT, LLC,<br><br>Defendants. | **CLASS ACTION COMPLAINT**<br><br>Civil Action No. 3:14-CV-432 |

Plaintiff, as and for her Class Action Complaint, alleges the following upon information and belief based upon the investigation of her attorneys and upon her own personal knowledge as to her ownership of the stock of Apple REIT Eight., Inc. ("A-8") and the Dividend Reinvestment Plan ("DRIP").

## I.

## NATURE OF THE ACTION

1. This is a shareholder class action asserting claims on behalf of the pre-merger public common shareholders of A-8[1] and Apple REIT Seven, Inc.[2] ("A-7") arising out of A-7

---

[1] A-8, was, before the merger, a non-traded REIT organized under the laws of Virginia with a class of securities registered under Section 12(g) of the Exchange Act and is subject to the reporting requirements of Section 13(a) of the Exchange Act. A-8 owned 51 hotels operating in 19 states as of December 31, 2012. A-8 raised approximately $1 billion between January 2007 and April 2008, and had approximately 19,700 beneficial unit holders as of February 28, 2013.

1

and A-8 dividend reinvestment plans, from July 17, 2007 through June 30, 2013 (the "Class Period").

2. Upon information and belief, during the Class Period, the Class purchased over $124 million of A-7, and $99 million of A-8 shares at the inflated price of $11.00 per share under the respective REIT's DRIP.

3. The Plaintiff and members of the Class received fewer A-7 and A-8 shares in the DRIPs than the actual number to which they were entitled because Defendants approved a valuation of shares at $11.00 per share for calculating the number of shares which DRIP electors would receive in lieu of the declared cash dividend or distribution.

4. As detailed in *In the Matter of Apple REIT Eight, Inc., et al.*, Securities & Exchange Commission Admin. Proceeding, No. 3-15750 in the "Order Instituting Cease-And-Desist Proceedings . . . Making Findings, And Imposing Civil Penalties ("Order"), Defendants knew that $11.00 per share did not represent the fair value of either A-7 or A-8 shares and therefore should not have been the price used to value the DRIP shares.

5. The SEC investigation found that "Apple REITs management received internal strategic planning analyses between late 2008 and 2011 that contradicted the REITs'

---

A-8 instituted a DRIP by filing a Form S-3 registration statement on April 23, 2008; it filed a post-effective amendment thereto on February 19, 2013. As of December 31, 2012, A-8 had sold approximately 9.1 million units representing approximately $99.9 million in proceeds pursuant to these DRIP offerings.

[2] A-7 was, before the merger, a non-traded REIT organized under the laws of Virginia with a class of securities registered under Section 12(g) of the Exchange Act and is subject to the reporting requirements of Section 13(a) of the Exchange Act. A-7 owned 51 hotels operating in 18 states as of December 31, 2012. A-7 raised approximately $1 billion between May 2005 and July 2007, and had approximately 19,800 beneficial unit holders as of February 28, 2013. A-7 instituted a DRIP by filing a Form S-3 registration statement on July 17, 2007, which it amended and restated on January 13, 2012. As of December 31, 2012, A-7 had sold approximately 11.3 million units representing approximately $124.5 million in proceeds pursuant to these DRIP offerings.

representations that $11.00 constituted the 'fair market value' of the units in their Form S-3 and the 'estimated market value' of the units in their Forms 10-K." Order ¶28.

## II.
## THE PARTIES

### A. Plaintiff

6. Plaintiff Dorothy Wenzel was at all relevant times a shareholder of A-8 before it was merged into Apple REIT Nine on or about February 25, 2014 who elected to reinvest her A-8 dividends in A-8 stock rather than take the cash offer of dividends.

7. Plaintiff received distributions on her A-8 investment which she was permitted to accept in cash or A-8 shares. She elected to receive shares instead of cash but the Defendants dictated that A-8 would value the shares at $11.00/share for purposes of calculating the amount of shares she would receive in return for her reinvestments of dividends and distributions throughout the Class Period. Plaintiff and the Class were forced to rely on the valuations of A-8 and A-7 shares set by the Defendants. Since the Apple REITs are "non-traded REITs" (because their shares are not registered for trading on any exchange), there is no public market price for any Apple REIT shares. Accordingly, Apple REIT management sets the "value" for Apple REIT shares for DRIP purposes.

### B. Defendants

8. Defendant Glade M. Knight is the Chairman and Chief Executive Officer of each of the Apple REITs. He is also the direct or indirect owner of all of the related entities that provide property management, acquisition, advisory, operational, and managerial services to the Apple REITs, including the Apple REIT entity Defendants named herein.

9. Defendant Michael S. Waters was a director of A-8 from 2007 through the Merger. Waters was a member of A-8 Audit Committee.

10. Defendant Robert M. Wily has been a director of A-8 from 2007 through the date of the merger. Wily was member of the A-8 Audit, Compensation and Executive Committees.

11. Defendant James C. Barden was a director of A-7 and an A-7 Executive Committee member through the date of the Merger.

12. Defendants Kent Colton, Glenn W. Bunting and Lisa B. Kern were also directors of A-7 and/or A-8 during the Class Period.

13. Justin Knight, David McKenney, Kristian Gathright, and Bryan Peery are with Glade Knight the "Apple REIT Management Defendants", and are, upon information and belief, the management team of the Apple REITs who formulated the dividend policies, and recommended to directors of A-7 and A-8 the declaration of dividends and distributions and recommended the $11.00 valuation to be used to calculate the value of the DRIP shares.

14. Apple Seven Advisors, Inc. ("A7A"), a Virginia corporation wholly owned by Glade M. Knight, is the adviser to A-7. The advisory agreement requires A7A to provide, *inter alia,* day-to-day management services to A-7 and provides for an annual asset management fee ranging from 0.1 to 0.25% of the amount raised in the offerings.

15. Apple Eight Advisors, Inc. ("A8A"), a Virginia corporation wholly owned by Glade M. Knight, is the adviser to A-8. The advisory agreement requires A8A to provide, *inter alia;* day-to-day management services to A-8 and provides for an annual asset management fee ranging from 0.1 to 0.25% of the amount raised in the offerings.

16. Apple Fund Management, LLC ("AFM"), a wholly owned subsidiary of Apple REIT Six, Inc. ("A-6") during the relevant time period, was an entity utilized by the advisers, which have no employees, to provide the management services, including the executive officers,

4

required by the advisory contracts to, *inter alia,* A-6, A-7, A-8, and Apple REIT Nine, Inc. Previously, AFM was a subsidiary of Apple Hospitality Five, Inc. ("AH5"). After AH5 merged with a third-party in 2007, the board of directors transferred AFM to A-6.

17. The Defendants identified in ¶¶ 14-16 are collectively referred to as the "Apple REIT Entity Defendants" and are named herein because it was they who employed and/or engaged the Apple REIT Management Defendants to provide services to A-7 and A-8 including services attendant to the DRIP. Alternatively, it was one or a combination of all the Apple REIT Entity Defendants who determined the $11.00 per share would be the DRIP price for common stock.

## III.
## JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) and/or § 1332(d)(2). The Court has subject matter jurisdiction under 28 U.S.C. § 1332(d) because the aggregate amount in controversy exceeds $5,000,000 and at least one class member is a citizen of a state different from a defendant.

19. Venue is proper under Section 28 U.S.C. § 1391(a) and (b) because a substantial part of the acts and omissions giving rise to the claims in this action occurred in this District and certain of the Defendants have their principal place of business within this District.

## IV.
## CLASS ALLEGATIONS

20. This action is brought by Plaintiff, for herself and on behalf of all others similarly situated, as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2) and (b)(3). Plaintiff seeks to represent the following proposed class:

> All persons and entities (other than Defendants, Apple REIT insiders or affiliates) who elected to participate in the A-7 and/or A-8 DRIP from July 17, 2007 through June 30, 2013 and received A-7 or A-8 common stock in lieu of cash at a value of $11.00 per share.

21. Excluded from the class are Defendants and any person, firm, trust, corporation, or other entity related to or affiliated with any of Defendants or any of Apple REIT's partners, subsidiaries, affiliates or joint ventures.

22. <u>Numerosity</u>. The members of the class are so numerous and dispersed that it would be impracticable to join them individually. There are approximately tens of thousands of investors in A-7 and A-8, and there were thousands of DRIP participants during the Class Period. While Plaintiff does not know the exact number of members of the class and subclasses at this time, Plaintiff believes there are, at minimum, thousands of members of the class. Defendants' records contain sufficient information to determine the exact number of persons in the class.

23. <u>Existence and Predominance of Common Questions</u>. Common questions of law and fact exist as to all class members and predominate over questions affecting only individual members. These common questions include the following:

    (a) The nature of the fiduciary duties owed to Plaintiff and class members and the standard of review to be applied in reviewing Defendants' compliance or not in their fiduciary duties;

    (b) Whether the Defendants breached and/or aided and abetted other Defendants' breach of fiduciary duty;

    (c) Whether Defendants breached the duties of care, candor and loyalty they owed to Plaintiff and class members;

    (d)    The true value of A-7 and/or A-8 for DRIP purposes;

    (e)    Whether Defendants' fiduciary breaches caused Plaintiffs and class members direct damages;

    (f)    Whether the Apple REIT Entity Defendants were negligent and/or reckless in calculating the value of DRIP shares;

    (g)    The amount of direct damage suffered by Plaintiff and class members;

    (h)    What remedies are appropriate to address the damages caused to Plaintiff and class members; and

    (i)    Whether the Plaintiff and class members are entitled to a reasonable award of attorneys' fees, interest and costs of suit.

24.    <u>Typicality</u>. Plaintiff's claims are typical of the claims of the members of the class she represents because they all participated in the DRIP.

25.    <u>Adequacy of Representation</u>. Plaintiff will adequately represent and protect the interests of the class and has no interests that conflict with or are antagonistic to the interests of class members. Plaintiff has retained attorneys who are experienced and capable of prosecuting complex litigation. Plaintiff's attorneys will actively conduct and be responsible for prosecuting this litigation, and have adequate resources, experience and commitment to litigate this matter.

26.    <u>Superiority</u>. A class action is superior to any other method available for the fair and efficient adjudication of this controversy because it would be impractical and unduly burdensome for each of the individual class members to bring a separate action. Moreover, individual litigation has the potential to result in inconsistent or contradictory judgments. A class action in this case presents fewer management problems and provides the benefits of a

single adjudication, economies of scale, and comprehensive supervision by a single court.

27. Class certification is also appropriate because there is a readily identifiable class on whose behalf this action can be prosecuted. Class members are readily ascertainable from Defendants' records. A notice of pendency or resolution of this class action can be provided to class members by direct mail, email, publication notice, or other similar means.

28. In the alternative, the class may be certified under Rule 23(b)(1) or 23(b)(2) because:

(a) The prosecution of separate actions by the individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual class members, which would establish incompatible standards of conduct for Defendants;

(b) The prosecution of separate actions by individual class members would create a risk of adjudications that would, as a practical matter, be dispositive of the interests of other class members not parties to the adjudications, or would substantially impair or impede their ability to protect their interests; and

(c) Defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief with respect to the members of the class as a whole.

## V.
## BACKGROUND

### A. The Apple REITs' Misrepresentations And Overvaluation Of Shares For DRIPs

29. A real estate investment trust, or REIT, is an entity that owns and operates income-producing real estate and distributes the income to investors. REITs pool the capital of numerous investors to purchase a portfolio of properties the typical investor might not be able to buy individually. To qualify as a REIT, a company must have most of its assets and

income tied to a real estate investment and must distribute at least 90% of its taxable income to shareholders annually in the form of dividends. To be sustainable, a REIT's dividends should be funded by cash flows from the income-producing properties. Accordingly, if the Apple REITs wanted to exist as REITs and avoid taxes and sell shares, they were required to declare dividends in the amount of at least their (otherwise) taxable income.

30. Following the close of their initial offerings, the Apple REITs each instituted a DRIP wherein they each sold DRIP units on a monthly basis during the relevant period.[3] The Apple REITs primarily used the DRIP proceeds to redeem units under their limited unit redemption programs. Under the terms of the unit redemption programs, the number of units redeemed could not exceed the aggregate net proceeds received from DRIP sales and the additional share option program.

31. The Apple REIT shares do not trade on any securities exchange and are illiquid. All of the Apple REIT shares sold for $11.00 per share (after the first 5% was sold for $10.50 at issuance). The Apple REITs never allowed this "official" par valuation to be changed even after it became apparent that A-7 and A-8 were worth significantly <u>less</u> than $11.00 per share. The Apple REITs did not have sufficient controls in place to meaningfully evaluate whether changes in market conditions or other factors required changes to their valuation disclosures in their Forms S-3 and Forms 10-K. $11.00 thus became the "default" valuation for the DRIP shares despite significant reliable evidence which reflected that the "fair value" and/or "market value" of A-7 and A-8 shares was less than $11.00/share.

---

[3] The Apple REITs' DRIPs were continuous offerings during the relevant period. A-7 and A-8 suspended their DRIPs and redemptions on or about June 27, 2013, in connection with the evaluation of a potential consolidation transaction in which A-7, A-8 and A-9 would be combined according to Form 8-K filed on June 27, 2013. That merger was completed in 2014.

32. Until May 2011, David Lerner Associate's (DLAs) monthly customer account statements showed an $11.00 market price and market value for each of the Apple REITs. DLA is the only broker through whom A-7 and A-8 is redeemable or "tradeable", in theory. The statements said that the share prices were calculated using several factors, including the then-current value of the assets in each Apple REIT: "The per share estimated values for the Apple REIT securities are based on information provided by the issuer in the Annual Reports and are developed after considering, where appropriate: the current per share offering price; the per share price utilized in the issuer's dividend reinvestment and share redemption plans; and the value of the issuer's assets." Beginning in May 2011, however, the statements have described the shares as "not priced."

33. Between at least 2008 and 2012, the Apple REITs each paid between 7% and 8% of the $11 value in distributions (which generally included a component of return of capital), with the exception of A-8, which lowered its distribution to 5% in June of 2011. The Apple REITs generally have paid more in distributions than they generated in cash from operations. The Apple REITs disclosed in their registration statements that, although they generally seek to make distributions from operating revenues, they may pay distributions in part from financing proceeds or other sources, including offering proceeds.

34. During the relevant period, the A-7 and A-8 Form S-3 DRIP Registration Statements contained material misstatements and omissions concerning valuation. In certain of their Forms 10-K the same misrepresentations also appeared.

35. Item 5 of Form S-3 requires registrants to include a description pursuant to Item 505 of Regulation S-K of the "various factors considered in determining [the] offering price" where common equity is being registered for which there is no established public trading market.

Item 5 of Form 10-K requires registrants to furnish pursuant to Item 201 of Regulation S-K certain high and low bid information if the principal United States market is not an exchange and to qualify such quotations with an appropriate explanation "[w]here there is an absence of an established public trading market."

36. In a section titled, *"How are unit prices determined?"*, the Apple REITs' initial Forms S-3 registration statements, as drafted by outside counsel, represented that:

> The price of units purchased under the plan directly from us by dividend reinvestments will be based on the fair market value of our units as of the reinvestment date as determined in good faith by our board of directors from time to time.
>
> Our units are not publicly traded; consequently, there is no established public trading market for our units on which we could readily rely in determining fair market value. Nevertheless, the board has determined that, for purposes of this plan, at any given time the most recent price at which an unrelated person has purchased our units represents the fair market value of our units. Consequently, unless and until the board decides to use a different method for determining the fair market value of our units, the per unit price for the plan will be determined at all times based on the most recent price at which an unrelated person has purchased our units. Notwithstanding the foregoing, the board of directors may determine a different fair market value and price for our units for purposes of this plan if (1) in the good faith judgment of the board an amount of time has elapsed since our units have been purchased by unrelated persons such that the price paid by such persons would not be indicative of the fair market value of our units or (2) our board determines that there are other factors relevant to such fair market value.... (Emphasis added).[4]

37. Although the Forms S-3 disclosed that "the per unit price for the plan will be determined at all times based on the most recent price at which an unrelated person has

---

[4] A-7 filed an amended and restated Form S-3 on January 13, 2012, which, among other things, disclosed that "the market value of [its] units and the unit price of units purchased from [it] under the plan will not be based an appraisal or other valuation of [A-7], [its] net assets, or the units, and will not necessarily reflect [its] value, earnings, net worth or other measures of value, but rather will be deemed equal to the most recent price at which an unrelated person has purchased our units from [it]." A-7, A-8, and A-9 filed post-effective amendments to their Forms S-3 on February 19, 2013 incorporating substantially similar language.

11

purchased our units," the disclosures omitted to state that the "fair market value" of the units was not based on appraisal of the Apple REITs' assets or other valuation methodology. They also failed to disclose that, in contrast to an actively traded market, the price last paid for a DRIP share by an unrelated person in the context of a non-traded REIT did not reflect a meaningful estimate of the underlying or realizable value of the units.

38. In addition, following the 2008 global financial crisis until the fiscal year that ended December 31, 2011, A-7 and A-8 represented in their Forms 10-K that "[t]he per share estimated market value of common stock is deemed to be the offering price of the shares; which currently is $11.00 per share." The Forms 10-K further represented that the disclosed estimated market value of $11.00 was "supported by the fact that the [REITs are] currently selling shares to the public at a price of $11.00 per share through ... Dividend Reinvestment Plan[s]".[5] However, the Forms 10-K failed to disclose that $11.00 did not reflect a meaningful estimate of the underlying value of the units.

39. Consequently, A-7 and A-8 maintained the arbitrarily established initial offering price of $11.00 as the "fair market value" and the "estimated market value" of the units following the 2008 global financial crisis despite internal and third-party analyses suggesting that the per unit values of the Apple REITs were below $11.00 and despite declines in operating performance.

### B. Internal and Third-Party Analyses Contradicted Statements And Valuation Disclosures In A-7 And A-8 Registration Statements

40. Following the 2008 global financial crisis, Apple REIT management received

---

[5]The Apple REITs stopped using the term "estimated market value" in Item 5 in their forms 10-K for the fiscal year ended December 31, 2011. Further in their Forms 10-K for the fiscal year ended December 31, 2012, the Apple REITs disclosed that the $11.00 price (or $16.25 in the case of A-9 due to a special distribution of $0.75 to unit holders relating to an asset sale on April 27, 2012) "[was] not based on an appraisal or valuation of the Company or its assets."

internal strategic planning analyses between late 2008 and 2011 that contradicted the REITs' representations that $11.00 constituted the "fair market value" of the units as stated in their Form S-3 and the "estimated market value" of the units as stated in their Forms 10-K

41. For example, in late 2008, an Apple REIT employee created a basic model for an executive officer estimating A-6, A-7, and A-8's performance over a five year period. The model was linked directly to the accounting system, was updated regularly through at least mid-2011 and was distributed to certain members of management. Although the primary purpose of the model related to evaluating future cash flow performance, the model included an estimated market value section calculating the REITs' enterprise, equity and per share values. The estimated market values of the A-6. A-7 and A-8 mostly showed per share values below $11.00. A different analysis performed by the same Apple REIT employee for an executive officer in August 2009 showed that, without substantial revenue and FFO[6] increases, the per share values of A-6, A-7, and A-8 would be below $11.00.

42. In addition, starting in approximately mid-2009 through mid-2011, several third-party investment banks made presentations to Apple REIT management concerning potential strategic options for the Apple REITs. The estimated valuations included in these presentations varied and were not a static $11.00 per unit for A-6, A-7, and A-8 as represented in their Forms S-3 and Forms 10-K. Some of the per-unit valuations were below $11.00 for A-6 and most of the per unit valuation estimates were below $11.00 for A-7 and A-8.

---

[6]FFO, or Funds From Operations, is defined by the National Association of Real Estate Investment Trusts as net income (computed in accordance with GAAP), excluding gains/losses on sales of depreciable property, plus depreciation and amortization of real property used in operations, less preferred dividends and after adjustments for unconsolidated partnerships and joint ventures.

43. A-6, A-7, and A-8's operating performance following the 2008 global financial crisis also should have caused the Apple REITs to amend their disclosure of $11.00 as a "fair market value" and "estimated market value" of units. A-6's, A-7's and A-8's net income declined more than 40% in 2009 as compared to 2008, and remained below 2008 levels through at least December 31, 2012.

44. A-6, A-7, and A-8 also increased their debt levels between 2008 and 2012. Increased debt levels may affect the Apple REITs' valuations because any debt incurred by the REITs must eventually be repaid, thereby reducing the equity available for distribution to unitholders in connection with a liquidity event. A-6, A-7, and A-8 nonetheless never adjusted the $11.00 per unit valuation disclosures.

45. Starting in May 2011, DLA changed the estimated market price and estimated market value for Apple REIT shares on its customer account statements from $11.00 to "not priced." DLA deleted the explanation of how the share value was calculated from the statements, and gave no explanation for the change to "not priced." The SEC has determined that A-7 and A-8 were overvalued at $11.00 per share.

46. In a June 2, 2011 New York Times article about DLA and the Apple REITs entitled "Statements Skip Over REIT's Woes," Defendant Knight was quoted as saying, "Who knows what the value is? I would not be comfortable in saying it was $4, $5, or $6. If I said I could sell it for $12, I would be sued."

47. In June 2011, Mackenzie, Patterson, Fuller, LP ("MPF"), a company engaged in trading discounted and distressed real estate securities, offered to purchase A-7 and A-8 shares for $3 per share and estimated that the liquidation value of A-7 was approximately $4.15 per share and A-8 was approximately $4.10 per share. The REITs recommended

rejection of the tender offer and stated that, as of March 31, 2011, the A-7 shares had a per unit "book value" of $7.83 and the A-8 shares had a per unit "book value" of $7.57.

48. In September 2011, MPF made a new tender offer of $5 per share for A-6 and $4 per share for A-7 and A-8, estimating that the liquidation value for A-6 was approximately $6.98 per share, A-7 was approximately $4.88 per share, and A-8 was approximately $4.26 per share. Defendants again recommended rejection of the offer and stated that as of June 30, 2011, the per unit book value of A-6 shares was $7.73, A-7 shares was $7.71, and A-8 shares was $7.42.

### C. Failure to Implement Sufficient Processes or Procedures to Evaluate the Valuation Disclosures

49. Despite the representation in the Forms S-3 that the Apple REITs' boards of directors would determine in good faith the fair market value of the DRIP units from time-to-time, the Apple REITs failed to develop or maintain sufficient procedures relating to the disclosure of the valuation of units sold in the DRIPs. The Apple REITs did not establish a valuation committee or valuation working group. Nor did they establish any formal or informal valuation guidelines or otherwise attempt to identify relevant factors for determining fair market value. Further, management did not provide the boards of directors with the contradictory internal valuations discussed herein or the contradictory third-party valuations for consideration in determining fair market value referenced herein.

### D. Defendants' Fiduciary Duties To Plaintiff And The Class

50. Virginia Code § 13.1-690(a) governs the "General Standards of Conduct for Director."

> A director shall discharge his duties as a director, including his duties as a member of a committee, in accordance with his good faith business judgment of the best interests of the corporation.

15

51. The directors are not entitled to the exculpatory, or safe harbor, provision of Virginia Code § 13.1-690(B)(1)-(3) because each director knew that his reliance on information, opinions reports, or statements prepared and/or presented by (i) officers or employees of any Apple REITs; (ii) legal counsel, public accounts or other professional; and/or (iii) the A-9 Special Committee, was unwarranted.

52. Virginia Code § 13.1-690 applied by its terms only to the director defendants. Accordingly, Defendants Knight, McKenney, Gathright and Peery are not entitled to the benefit of these provisions and their conduct must be adjudicated under standards of common law fiduciary duties under Virginia law which does not include the statutory exculpations and safe harbors accorded to eligible director Defendants.

53. The limitation of liability stated in Virginia Code § 13.1-692 is not applicable because the Defendants engaged in willful misconduct.

### E. None Of The Defendants Is Shielded From Liability By The Business Judgment Rule

54. None of the Defendants is entitled to a presumption under the Business Judgment Rule or under any provision of the Virginia Code because none of the Defendants acted on a fully informed basis.

### COUNT I

(Breach Of Fiduciary Duties of Care and Loyalty Against The Individual Defendants On Behalf Of Plaintiff And The Class And Aiding And Abetting Thereof By The Apple REIT Entity Defendants)

55. Plaintiff repeats and re-alleges the preceding allegations set forth in paragraphs 1-54, 62-64 and 66-69 as if fully set forth herein.

16

56. The Individual Defendants were charged with duties of due care and loyalty, to act rationally, in good faith and to inform themselves of all material information reasonably available to them in making decisions on behalf of A-7 and/or A-8. The Individual Defendants were further charged with the duty of loyalty, to act in the best interest of A-8 and/or A-7 shareholders, to avoid self-dealing in which the Individual Defendants' interests would be placed above the interest of A-7 and/or A-8 and its shareholders, and, when seeking shareholder action such as an election to participate in a DRIP, to fully and fairly disclose all material facts to shareholders concerning the action for which such approval was sought.

57. The individual Defendants approved a dividend reinvestment value for A-7 and A-8 during the Class Period at $11.00 per share even through Defendants knew that there was no support for such a valuation and in fact objective, reliable, verifiable information contradicted the $11.00 valuation.

58. Because of their conduct, as detailed herein, the individual Defendants have breaching their fiduciary duties owed to the shareholders of A-7 and A-8.

59. The Apple REIT Entity Defendants have knowingly aided and abetted the fiduciary breaches and are liable to the same extent as the Individual Defendants.

60. Plaintiff and the Class have been damaged by Defendants' breach of fiduciary duties.

## COUNT II

**(Breach Of Fiduciary Duty Of Loyalty And Candor Against All Individual Defendants, For Issuing Materially False And Misleading Statements To Plaintiff And The Class)**

61. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-60 and 66-69 as if fully set forth herein.

62. Individual Defendants knowingly caused A-7 and A-8 to issue false and misleading Proxy statements, 10Ks and Form S-3s.

63. As a result of such knowing breach of duty of candor, Defendants caused damage to Plaintiff and all class members who participated in the DRIPs during the Class Period.

64. As a result, Plaintiff and the Class have suffered damage

## COUNT III

**Negligence And Gross Negligence Against Defendants Apple Seven Advisers, Inc., Apple Eight Advisers, Inc. And Apple Fund Management, LLC**

65. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1-64 as if fully set forth herein.

66. The Apple REIT Entity Defendants were all engaged by, or on behalf of, A-7 and A-8 to provide services that included management, operation, financial reporting and calculation of valuations of A-7 and A-8 shares or the maintenance of accurate books and records and robust accurate and appropriate financial reporting systems to ensure the accurate and honest valuation of A-7 and A-8 shares for DRIP purposes.

67. During the Class Period, the Apple REIT Entity Defendants were under a duty to shareholders of A-7 and A-8.

68. The Apple REIT Entity Defendants breached their duties by utilizing and/or allowing A-7 and A-8 to utilize an $11.00 valuation for DRIP purposes during the Class Period.

69. As a result of such negligence and gross negligence, Plaintiff and the Class have suffered loss and damage.

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A. Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative;

B. Directing Defendants to account to Plaintiff and the Class for their damages sustained because of the wrongs complained of herein;

C. Awarding damages to the Plaintiff and the class from the Defendants;

D. Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

E. Granting such other and further relief as this Court may deem just and proper.

Dated: June 16, 2014                              **DOROTHY WENZEL**

By Counsel

_____
Jeffrey Hamilton Geiger (V.S.B. No. 40163)
Sands Anderson PC
1111 East Main Street, Suite 2400
P.O. Box 1998
Richmond, Virginia 23218-1998
Tel: (804) 783-7248
Fax: (804) 783-7291
jgeiger@sandsanderson.com

Lee Squitieri (To Be Admitted *Pro Hac Vice*)
Raymond Barto (To Be Admitted *Pro Hac Vice*)
SQUITIERI & FEARON, LLP
32 East 57th Street, 12th Floor
New York, New York 10022
Tel: (212) 421-6492
Fax: (212) 421-6553
lee@sfclasslaw.com
raymond@sfclasslaw.com

Daniel R. Lapinski (To Be Admitted *Pro Hac Vice*)
Kevin P. Roddy (To Be Admitted *Pro Hac Vice)*
WILENTZ, GOLDMAN & SPITZER P.A.
90 Woodbridge Center Drive
Woodbridge, New Jersey 07095
Tel: (732) 855-6066
Fax: (732) 726-4735
dlapinski@wilentz.com
kroddy@wilentz.com