# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA

**Richmond Division**

DOROTHY WENZEL, on behalf of
herself and all others similarly situated,

      Plaintiff,

v.                                    Case No. 3:14-cv-432

GLADE M. KNIGHT, et al.,

      Defendants.

## <u>OPINION</u>

Apple REIT Eight, Inc. ("A8"), the company at the center of this suit, created a program that allowed its shareholders to forgo a cash dividend in favor of receiving more shares in the company. Wenzel, an A8 shareholder, brings this putative class action against A8, its directors, managers, and advisors, alleging that they set the price for those dividend-reinvestment shares at an artificially high rate. Having already had her first complaint in this matter dismissed, Wenzel comes back for a second bite. She asks the Court to find that, in setting the share price so high, the defendants breached a contract, interfered with her business expectancy, defrauded shareholders, committed negligence, and perpetrated Virginia state law securities fraud. The defendants filed this motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).

Wenzel originally brought this action against A8 and Apple REIT Seven, Inc. ("A7"), a similarly managed but legally distinct real estate investment trust. The Court dismissed that original complaint because Wenzel lacked standing to sue on behalf of A7 shareholders, failed to appropriately assert fiduciary breach claims against A8 as derivative actions, and failed to state a

claim for negligence. Despite the complaint's inadequacies, the Court allowed Wenzel an opportunity to amend her complaint. She subsequently filed her first amended complaint (FAC), which provides the basis for the defendants' current motion to dismiss.

Wenzel's first amended complaint lodges six class claims against various groupings of the defendants. First, she seeks a declaration that her participation in the dividend reinvestment program, known as the "DRIP," constituted a contract between her and A8. Second, she claims the individual defendants breached that contract. Third, she claims the individual defendants tortiously interfered with her contract and her expected return in the DRIP. Fourth, she alleges the individual defendants committed fraud and constructive fraud by making false statements and material omissions in the DRIP paperwork. Fifth, she asserts that A8's advisers were negligent in their duty to oversee the DRIP. Finally, she claims a violation of the Virginia Securities Act.

None of her allegations state a claim.

The Court declines to exercise its declaratory judgment jurisdiction over a claim that simply duplicates the breach of contract claim without adding anything more. With no efficiencies to be gained by declaring Wenzel's DRIP participation to be a contract, the Court sees no need to reach the issue, and thus grants the motion to dismiss as to Count I.

With respect to the breach of contract claim, the actions Wenzel alleges the defendants took align with the terms of the purported agreement on share pricing. Wenzel's facts make clear that the DRIP operated exactly as contemplated and that the defendants upheld their end of the contract. Without a breach of contract plausibly alleged, the Court grants the motion to dismiss with respect Count II.

The tortious interference claims also fail because Wenzel does not adequately allege that any of the defendants were parties to her contract or competitors to her business expectancy,

necessary elements of those claims. The Court therefore grants the motion to dismiss as to Count III.

Wenzel's fraud claims fail to meet the particularity pleading standard required under Rule 9(b) of the Federal Rules of Civil Procedure. With respect to the alleged omissions of fact, Wenzel fails to plausibly allege that the omissions were material, considering that the DRIP pricing operated exactly as contemplated by what was said in the DRIP documents. The Court grants the motion to dismiss as to Counts IV and VI.

Finally, the negligence claim meets the same fate as its progenitor in the original complaint. With a faulty legal basis and no factual support for the existence of a duty, Wenzel fails to state a claim for negligence. Thus, the Court grants the motion to dismiss Count V.

## I. MATERIAL FACTS

The Court previously laid out the material facts in its opinion dismissing Wenzel's first complaint. *See Wenzel v. Knight*, No. 3:14-cv-432, 2015 WL 222182 (E.D. Va. Jan. 14, 2015). The facts in Wenzel's first amended complaint mirror those from the original complaint, so the Court will only briefly outline the background information.

Apple REIT 8, Inc.,[1] was a real estate investment trust, a company that uses investors' money to purchase and operate revenue generating properties. In A8's case, most of those holdings consisted of hotel and hospitality properties. Defendants Glade Knight, Michael Waters, Robert Wily, Kent Colton, and Glenn Bunting sat on the board of directors for A8. Defendants Justin Knight, David McKenney, Kristian Gathright, Bryan Peery, as well as Glade

---

[1] In March 2014, A8 and A7 became wholly owned subsidiaries of Apple REIT Nine, Inc., which then changed its name to Apple Hospitality REIT, Inc. For the sake of clarity, the Court refers to the company in its pre-merger form.

Knight comprised the team of managers for A8.[2] According to the first amended complaint, A8 itself had no employees. Instead, A8's managers worked for Apple 8 Advisers, Inc. ("A8A"), and Apple Fund Management, Inc. ("AFM"), two separate entities that A8 hired to provide management services to A8's portfolio of assets.

Starting in 2008, A8 instituted a dividend reinvestment program, or DRIP, which allowed shareholders to directly invest any cash dividends declared by A8's board back into the company in exchange for more shares. By participating in the DRIP, that reinvestment occurred automatically at a rate set by the board. According to the Form S-3 Registration Statement that A8 filed with the Securities and Exchange Commission to register the DRIP, that price was initially set at $11.00 per share. The Form S-3 stated that the board chose $11.00 per share because it was "the most recent price at which an unrelated person has purchased our units." From 2008 until 2011, the DRIP shares continued to be priced at $11.00 each.

According to the first amended complaint, A8 management received internal analyses throughout this time period that suggested A8's per-share value fell short of the $11.00 price assigned by the board. Additionally, in 2011 a potential third-party buyer offered to purchase A8 shares for $3.00 per share and then $4.00 per share, but the A8 board rejected both offers. According to Wenzel, the board stated that A8's value hovered somewhere between $7.00 and $8.00 per share. Beginning in May 2011, the DRIP shares were listed as "not priced."

Wenzel alleges that she is a shareholder in A8 who opted to participate in the DRIP. She brings this putative class action on behalf of all those who participated in A8's DRIP between 2007 and 2013 and received shares at the exchange rate of $11.00 each.

---

[2] Collectively, the directors and managers comprise the "individual defendants" in Wenzel's first amended complaint.

## II. DISCUSSION[3]

### A. Count I: Declaratory Judgment

Wenzel first seeks a declaratory judgment that "the declaration of a cash dividend and Plaintiff's election to take a stock dividend in lieu of the cash dividend constituted a contract." FAC ¶ 54. This claim essentially mirrors the breach of contract claim asserted in Count II. For this reason, a declaratory judgment is inappropriate, and the Court declines to exercise its discretionary jurisdiction under the Declaratory Judgment Act.

The Declaratory Judgment Act gives district courts the discretion to "declare the rights and other legal relations of any interested party seeking a declaration." 28 U.S.C. § 2201(a). An action for a declaratory judgment generally provides "a means by which rights and obligations may be adjudicated in cases involving an actual controversy that has not reached the stage at which either party may seek a coercive remedy and in cases in which a party who could sue for coercive relief has not yet done so." Wright, Miller & Kane, *Fed. Prac. & Proc.*, § 2751 (3d ed. 1998). Accordingly, courts have refused to entertain declaratory judgment actions when the plaintiff brought the action to remedy past behavior rather than prevent future harm. *E.g., Tapia v. U.S. Bank, N.A.*, 718 F. Supp. 2d 689, 695-96 (E.D. Va. 2010), *aff'd*, 441 F. App'x 166 (4th Cir. 2011) (denying declaratory relief when the alleged harm "has already occurred"). Wenzel does not seek a declaration that the A8 dividend reinvestment scheme constituted a contract in

---

[3] A Rule 12(b)(6) motion to dismiss gauges the sufficiency of a complaint without resolving any factual discrepancies, testing the merits of the claim or judging the applicability of any defenses raised by the non-moving party. *Republican Party of N.C. v. Martin*, 960 F.2d 943, 952 (4th Cir. 1992). A 12(b)(6) motion considers whether the non-moving party's description of the facts, if assumed to be completely true, would entitle him to the requested relief. *Unus v. Kane*, 565 F.3d 103, 115 (4th Cir. 2009). To survive a 12(b)(6) motion to dismiss, a complaint must state facts that, when accepted as true, "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

order to clarify the future, but rather to "substantially advance or terminate several of the claims asserted" in the complaint. FAC ¶ 56.

In fact, the claim for a declaratory judgment more or less attempts to shore up Count II, Wenzel's claim for breach of contract. Faced with similar scenarios, courts have dismissed declaratory judgment claims that simply duplicate a breach of contract claim. *See Metra Indus., Inc. v. Rivanna Water & Sewer Auth.*, No. 3:12-cv-049, 2014 WL 652253, at *2 (W.D. Va. Feb. 19, 2014) (listing cases in which courts found declaratory judgment actions unnecessary when brought to resolve a parallel breach of contract claim). The coexistence of both claims for breach of contract and declaratory judgment does not necessarily moot the need for a declaratory judgment, but when the same party brings both claims to obtain essentially identical relief, the declaratory judgment serves little useful purpose. *Cf. Seneca Ins. Co. v. Shipping Boxes I, LLC*, 30 F. Supp. 3d 506, 513 (E.D. Va. 2014) (allowing breach of contract and declaratory judgment claims to move forward because "the two claims are brought by *opposing* parties" (emphasis added)).

In short, Count I does not bring anything to the complaint that is not achieved by Count II. This gives the Court "good reason" to decline to entertain the declaratory judgment claim. *Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co.*, 386 F.3d 581, 594 (4th Cir. 2004) (explaining "a district court must have 'good reason' for declining to exercise its declaratory judgment jurisdiction").

Accordingly, the Court grants the defendants' motion to dismiss Count I.

### B. Count II: Breach of Contract

To survive a motion to dismiss for failure to state a breach of contract claim, the complaint must state sufficient facts showing: "(1) a legally enforceable obligation of a

defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury

or damage to the plaintiff caused by the breach of obligation." *Filak v. George*, 267 Va. 612,

619, 594 S.E.2d 610, 614 (2004).

### 1. The Existence of an Enforceable Agreement

The first amended complaint does not identify which specific document or agreement

constituted Wenzel's contract with the defendants, but instead simply alleges "[t]he individual

defendants issued an offer to Plaintiff and the Class, and made a contract with Plaintiff and all

Class members that A-8 would issue A-8's stock in place of a cash dividend." FAC ¶ 59.  In her

brief, however, Wenzel indicates that the Form S-3 Registration Statement filed with the

Securities and Exchange Commission represents the agreement.  Wenzel does not explain how a

registration form sent to the SEC could be a contract between the company and its investors, nor

does she identify when she received the DRIP documentation, whether she received the Form

S-3 or just the informational prospectus within it, or when she signed the DRIP authorization

form.  Nonetheless, the Court will assume for the purpose of this opinion that the Form S-3

Registration Statement represents what may be the terms of Wenzel's purported contract.

The first amended complaint and the Form S-3 set out the required elements of a

contract: offer, acceptance, and consideration.[4]  *See Montagna v. Holiday Inns, Inc.*, 221 Va.

---

[4] Generally, a court may look only to the complaint under a 12(b)(6) motion to dismiss.  But "when a plaintiff fails to introduce a pertinent document as part of his complaint, the defendant may attach the document to a motion to dismiss the complaint and the Court may consider the same without converting the motion to one for summary judgment." *Gasner v. County of Dinwiddie*, 162 F.R.D. 280, 282 (E.D. Va. 1995) (citing Wright & Miller, *Fed. Prac. & Proc*, § 1327, at 762-63 (2d ed. 1990)); *see also Stewart v. Pension Trust of Bethlehem Steel Corp.*, 12 F. App'x 174, 176 (4th Cir. 2001).  The first amended complaint frequently refers to A8's Form S-3, which the defendants attached to their motion to dismiss.  With the authenticity of that document unquestioned by the parties, *see Gasner*, 162 F.R.D. at 282, the Court may consider it on this motion to dismiss.  Wenzel also refers to other outside documents, such as the Form 10-

336, 346, 269 S.E.2d 838, 844 (1980). Specifically, the Form S-3 states, "[w]e are *offering* this Dividend Reinvestment Plan to our shareholders," and explains in unambiguous detail the purpose, structure, terms, and pricing of the plan. (Dk. No. 39-1, Exh. 1, at 4 (emphasis added).) Wenzel alleges she participated in the DRIP and received shares in lieu of cash, which indicates she accepted the offer. Consideration is also present because Wenzel passed up the opportunity to collect cash dividends in exchange for more shares of A8. *See Sager v. Basham*, 241 Va. 227, 229, 401 S.E.2d 676, 677 (1991) (describing consideration as "the price bargained for and paid for a promise," which can "be in the form of a benefit to the party promising or a detriment to the party to whom the promise is made" (citation omitted)). With these three elements stated, Wenzel pleads the existence of an enforceable agreement.

## 2. Breach

Although Wenzel plausibly alleges the existence of a contract, she does not state a claim for breach of contract for two reasons. First, she asserts breach of contract against only the individual defendants, when her claim actually lies against A8. Second, even if Wenzel properly brought the breach of contract claim against the proper defendant, the plain language of the terms of the DRIP make clear that the facts alleged by Wenzel do not constitute a breach.

### a. Individual Defendants' Contract Liability

The corporate form exists to limit the liability of directors and shareholders. *See Beale v. Kappa Alpha Order*, 192 Va. 382, 395, 64 S.E.2d 789, 796 (1951) (explaining that "[t]he fundamental concept of a corporation is that it is a separate entity created under the law to enable a group of persons to limit their liability in a joint venture"). As a general rule, therefore, a director, manager, or shareholder of a corporation usually cannot be held personally liable for the

K, but because those documents have not been attached to the motion to dismiss, the Court considers only the text quoted within the first amended complaint.

corporation's contracts. *Cheatle v. Rudd's Swimming Pool Supply Co., Inc.*, 234 Va. 207, 212, 360 S.E.2d 828, 831 (1987) ("The immunity of stockholders is a basic provision of statutory and common law and supports a vital economic policy underlying the whole corporate concept."). Wenzel alleges the breach against the individual defendants, not the company itself. The individual defendants may be held liable under the contract only if Wenzel asserts facts showing that: (1) each defendant entered into the contract in their individual capacity rather than on behalf of the corporation; or (2) the corporate veil should pierced.

The individual defendants include the five directors, Glade Knight, Michael Waters, Robert Wily, Kent Colton, and Glenn Bunting, as well as the five individuals identified as the management of A8, Justin Knight, David McKenney, Kristian Gathright, and Bryan Peery. Even assuming that the Form S-3 represents the operative contract in this case, that document contains the signatures of only the five directors and Bryan Peery. (Dk. No. 39, Ex. 1, at 30.) Wenzel offers no explanation in the first amended complaint as to how managers Justin Knight, McKenney, or Gathright could be bound by the DRIP agreement. The first amended complaint explains that management received valuations of A8, oversaw the day-to-day operations of the DRIP, and even recommended the $11.00 share price, but none of that explains how those individuals were parties who were bound by the contract set forth in the Form S-3.

With respect to the six individual defendants who signed the Form S-3, the language of the signature page shows that they did not act in their individual capacity. The signatures section of the Form S-3 states, "this Registration Statement has been signed by the following persons *in the capacities* and on the dates *indicated.*" (Dk. No. 39, Ex. 1, at 30 (emphasis added).) The title of each individual appears next to each signature: Glade Knight as "Director, Chairman of the Board of Directors, Chief Executive Officer and President;" Bryan Peery as "Senior Vice

9

President and Chief Financial Officer;" and Bunting, Colton, Waters, and Wiley as Directors. (*Id.*) Clearly, none signed the Form S-3 in their individual capacity, nor could they: the very purpose of the Form was to formally register the A8 dividend reinvestment program with the SEC. Without providing any facts showing that the individual defendants entered into the contract in anything other than their corporate capacity, Wenzel fails to show why any should be held individually liable.

In her brief, Wenzel argues that the first amended complaint contains sufficient facts to pierce the corporate veil and hold the individual defendants liable for the breach of contract. It does not. "[O]nly 'an extraordinary exception' justifies disregarding the corporate entity and piercing the veil." *C.F. Trust, Inc. v. First Flight L.P.*, 266 Va. 3, 10, 580 S.E.2d 806, 810 (2003) (quoting *Greenberg v. Commonwealth*, 255 Va. 594, 604, 499 S.E.2d 266, 272 (1998)). And though no single rule explains when corporate veil-piercing is permissible, the Supreme Court of Virginia has recognized that the usual circumstance is one in which the defendants have "controlled or used the corporation to evade a personal obligation, to perpetrate fraud or a crime, to commit an injustice, or to gain an unfair advantage." *Dana v. 313 Freemason*, 266 Va. 491, 501, 587 S.E.2d 548, 554 (2003) (quoting *O'Hazza v. Exec. Credit Corp.*, 246 Va. 111, 115, 431 S.E.2d 318, 320 (1993)). In those instances, the individual essentially uses the corporation to do his unjust bidding. *See id.* ("Piercing the corporate veil is justified when the unity of interest and ownership is such that the separate personalities of the corporation and the individuals no longer exist and to adhere to that separateness would work an injustice.").

Here, Wenzel presents no facts that show any of the individual defendants used Apple 8 or its dividend reinvestment program in order to evade their obligations, perpetrate a fraud for their own benefit, commit a crime, commit an injustice, or gain an unfair advantage. In fact, she

hardly distinguishes the individual defendants from A8, Apple 8 Advisers, or Apple Fund Management. At best, the first amended complaint concludes, without factual support, that the individual defendants breached their agreement with the shareholders for the benefit of A8. Without facts showing that the individual defendants insidiously operated A8 in order to further their own agenda, Wenzel's complaint does not state a plausible basis for piercing the corporate veil.

### b. No Breach of Contract

Even if Wenzel had named the right defendant in her breach of contract claim, Count II would still fail because the facts from the first amended complaint do not support a claim for breach. Assuming as true Wenzel's allegation that A8 overvalued its shares at $11.00 in the face of numerous events that should have brought that valuation down, A8 was under no obligation to set the price differently.[5]

In answer to the question, "How are unit prices determined?" the Form S-3 explains:

> The price of units purchased under the plan directly from us by dividend reinvestments will be based on the fair market value of our units as of the reinvestment date as determined in good faith by our board of directors from time to time.
> Our units are not publicly traded; consequently, there is no established public trading market for our units on which we could readily rely in determining fair market value. Nevertheless, *the board has determined that, for purposes of this plan, at any given time the most recent price at which an unrelated person has purchased our units represents the fair market value of our units*. Consequently, unless and until the board decides to use a different method for determining the fair market value of our units, *the per price unit for the plan will be determined at all times based on the most recent price at which an unrelated person has purchased our units*. Notwithstanding the foregoing, the board of directors may determine a different fair market value and price for our units for purposes of this plan if (1) in the good faith judgment of the board an amount of time has elapsed since our units have been purchased by unrelated persons such

---

[5] Although a court must accept the plaintiff's facts as true on a 12(b)(6) motion, it may nonetheless dismiss a breach of contract claim when those facts do not amount to breach under the terms of an unambiguous contract. *See Stewart*, 12 F. App'x at 176-77.

that the price paid by such persons would not be indicative of the fair market value of our units or (2) our board determines that there are other factors relevant to such fair market value.

The most recent price paid by an unrelated person for a unit was $11.00 on April 15, 2008. Accordingly, our board of directors has determined that the offering price for units purchased under the plan will initially be $11.00 per unit.

(emphasis added). Wenzel alleges that the defendants "breached their agreement with Plaintiff and other Class members by setting the value of A-8 stock and crediting them with A-8 stock that was worth less than the dollar amount of the cash dividend declared and paid to non-electing A-8 holders." FAC ¶ 63. The plain reading of the language above, however, makes obvious that the alleged conduct does not violate the terms of the agreement.

Wenzel argues that the agreement required the defendants to price the DRIP shares according to fair market value and reassess and alter the DRIP share price on a regular basis, but her argument ignores what the agreement says. Reading the entire contractual language together, the defendants explained that fair market value could not be readily ascertained because A8's shares did not trade on any public market. Accordingly, the defendants determined, at least at the outset of the DRIP, that "fair market value" would be set according to the last price paid by an outsider. To make matters perfectly clear, the agreement identifies that amount: $11.00 per share. Wenzel may have believed that the $11.00 price was set based on the underlying value of the assets in the real estate investment trust, but that belief is not supported by any contractual language or factual statements in the first amended complaint. Any shareholder agreeing to participate in the DRIP did so knowing the price ($11.00 per share) and the basis for that amount (it was the last price paid by an outsider). The defendants priced the DRIP units precisely in the manner contemplated by the Form S-3 and, therefore, did not breach the agreement.

Beyond the decision to set the DRIP unit price at $11.00 per share, Wenzel argues that the "[d]efendants had a *contractual obligation* to modify the per unit price to reflect additional

factors relevant to the determination of fair market value, such as those considered relevant by any generally accepted method of valuation." Pl.'s Brief 11-12 (emphasis added). But no such obligation is reflected by the language on pricing in the Form S-3. Instead, the agreement makes clear that the DRIP unit price would start at $11.00 each and continue at that price "unless and until the board decides to use a different method for determining the fair market value of [the DRIP] units." The agreement imposed no duty on the board to monitor, evaluate, or appraise the share values. Instead, it gave the board *discretionary* power to change the valuation method for DRIP shares. That the board refused to exercise its discretion is not the basis for a breach of contract claim.[6] Wenzel may have felt swindled when she realized that the underlying value of A8 did not support an $11.00 per share valuation, but that comes as a consequence of knowingly investing in a trust that was not traded on the open market, not the result of a breach of contract by any combination of defendants in this case.

Accordingly, the Court grants the defendants' motion to dismiss Count II.

### C. Count III: Tortious Interference with Contract and Business Expectancy

To state a claim for tortious interference, a plaintiff must show four elements:

---

[6] Wenzel argues in her brief that the defendants breached the implied covenant of good faith and fair dealing by arbitrarily refusing to "amend the price," something the board pledged to do "if the set price no longer reflected market value." Pl.'s Brief at 13. Wenzel alleges this claim in her brief but not in the first amended complaint, so the Court need not consider the argument. *See Davis v. Cole*, 999 F. Supp. 809, 813 (E.D. Va. 1998) (refusing to consider allegations made by the plaintiff outside the complaint and any exhibits attached thereto). Even so, the facts do not bear out the argument. Virginia law recognizes a breach of the implied covenant of good faith and fair dealing when a defendant acts dishonestly in a contract or exercises his discretion arbitrarily or unfairly. *See Stoney Glen, LLC v. S. Bank & Trust Co.*, 944 F. Supp. 2d 460, 466 (E.D. Va. 2013). According to the facts of the first amended complaint, the defendants behaved exactly as envisioned by the agreement, and, with respect to their obligations under the contract, Wenzel asserts no facts showing dishonesty. As to arbitrary or unfair exercises of discretion, because the board chose *not* to take action, Wenzel essentially asks the Court to recast the board's discretion to change DRIP pricing as an obligation to do so, which clearly is not supported by the language of the agreement.

13

(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.

*Dunlap v. Cottman Transmission Sys., LLC*, 287 Va. 207, 216, 754 S.E.2d 313, 318 (2014) (quoting *Chaves v. Johnson*, 230 Va. 112, 120, 335 S.E.2d 97, 102 (1985)). Implicitly required in this cause of action is the existence of a third party interferor who is not a party to the contractual relationship or, in the case of a business expectancy claim, is in competition with the plaintiff. *See Cox v. MAG Mut. Ins. Co.*, No. 3:14-cv-377, 2015 WL 1640513, at *4-5 (E.D. Va. Apr. 9, 2015) (discussing these requirements); *see also 17th St. Assocs., LLP v. Markel Int'l Ins. Co. Ltd.*, 373 F. Supp. 2d 584, 600 (E.D. Va. 2005) (explaining that Virginia cases "applying the tort of intentional interference with a business expectancy contain a fifth, unstated element to the prima facie case: a competitive relationship between the party interfered with and the interferor"); *Storey v. Patient First Corp.*, 207 F. Supp. 2d 431, 448 (E.D. Va. 2002) (noting "it is axiomatic that a party cannot interfere with his own contract").

Wenzel alleges the tortious interference claim against all the defendants except Apple Hospitality. But according to the first amended complaint, the individual defendants were parties to the contract, and thus could not tortiously interfere with it. Wenzel argues that an exception applies here, because the defendants acted outside the scope of their capacities for A8 when they interfered with the contract and hindered her business expectancy in the DRIP. Virginia does recognize an exception where an agent of a contractual party may be found to tortiously interfere with that contract if the plaintiff establishes that the agent acted outside the scope of his authority or agency. *See Cox*, 2015 WL 1640513, at *4 n.10. But Wenzel pleads no facts that show any of the defendants operated outside the scope of their employment or agency

relationships with Apple REIT 8. She argues that A8A and AFM were held out to shareholders as independent and legally separate entities, but that does not address the issue of whether they acted outside the scope of their agreements to provide services to A8. And with respect to the business expectancy claim, Wenzel fails to allege any facts that the defendants under Count III were in competition with her.

Accordingly, the Court grants the defendants' motion to dismiss Count III.

### D. Count IV: Fraud and Constructive Fraud

A complaint for fraud under Virginia law must plausibly allege: "(1) a false representation, (2) of material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled." *Evaluation Research Corp. v. Alqequin*, 247 Va. 143, 148, 439 S.E.2d 387, 390 (1994) (citations omitted). A claim for constructive fraud contains the same elements except that "the misrepresentation of material fact is not made with the intent to mislead, but is made innocently or negligently although resulting in damage to one relying on it." *Id.* These elements must meet the pleading requirements of Federal Rule of Civil Procedure 9(b), which requires a party to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). These circumstances are "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Baker v. Elam*, 883 F. Supp. 2d 576, 580 (E.D. Va. 2012) (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999)).

### 1. False Representations

To meet the particularity requirement for her fraud claim, Wenzel identifies specific paragraphs of her complaint as containing false representations made by the individual

defendants to the shareholders. *See* FAC ¶ 74 (citing ¶¶ 31, 33-35, and 37 as "false representations to Plaintiff and other Class members about the value of the A-8 stock" in the DRIP). None of these statements supports the claim of fraud.

First, almost none of the cited paragraphs meets the particularity requirements of Rule 9(b) because they group all the individual defendants together "with broad brush allegations instead of making specific factual allegations against individual defendants." *Feeley v. Total Realty Mgmt.*, 660 F. Supp. 2d 700, 712 (E.D. Va. 2009). Paragraphs 33, 34, 35, and 37 discuss the contents of A8's Forms S-3 and 10-K, but, at best, these statements can be attributed only to A8, not *all* of the individual defendants. Because Count III is brought against the individual defendants and not A8, none of those paragraphs meet the particularity requirements of Rule 9(b). *See Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 579 (E.D. Va. 2006) ("Grouping defendants together in a pleading fails to satisfy the requirement that the who, what, when, where, why, and how, be pled with specificity.").[7]

Second, paragraph 33 lobs a broad generalization that the Forms S-3 and 10-K "contained material misstatements and omissions concerning valuation." This statement merely recites a legal conclusion, which would not pass muster under the standard pleading requirement of Rule 8, let alone Rule 9(b). Similarly, paragraph 34 recites regulatory requirements for Forms S-3 and

---

[7] Wenzel points out that the Fourth Circuit has left open the possibility that "group-published information" may be alleged in support of a fraud claim, which would allow "a plaintiff to rely on a presumption that statements in company generated documents represent the collective work of those individuals directly involved in the company's daily management." *Dunn v. Borta*, 369 F.3d 421, 434 (4th Cir. 2004). Although the Fourth Circuit discussed the group-published information presumption in *Dunn*, it explicitly left open whether to recognize the approach. *Id.* Given that Wenzel alleges fraud not just against the board of directors but also individual management defendants whose day-to-day roles within the company go unexplained, the Court declines to apply the presumption.

10-K and provides no facts about the defendants whatsoever. Neither paragraph 33 nor paragraph 34 supports a claim for fraud.

Third, paragraph 31 describes the monthly customer account statements issued by David Lerner Associates ("DLA"), the primary broker for A8. According to DLA, among the variables considered for calculating DRIP share price, "where appropriate," were "the value of the issuer's assets." FAC ¶ 31. The conditional language "where appropriate" indicates that underlying asset value might not be considered in establishing the per share estimated value. Further, Wenzel's allegations do not provide any facts that show why that allegedly false statement should be linked to the defendants. Rather, the first amended complaint, by its own terms, says that the statement was made by DLA. Without any particularized facts that explain how the contents of the DLA customer statement should be attributed to all of the defendants except Apple Hospitality, paragraph 31 fails to set out a claim for fraud.

## 2. Material Omissions

Wenzel also alleges the defendants committed fraud by failing to make known certain facts that would have dissuaded shareholders from participating in the DRIP. FAC ¶ 79 (citing ¶¶ 36 and 39 as alleging "omissions of material fact"). Virginia state law "recognizes fraud by omission, sometimes called 'concealment.'" *Bank of Montreal v. Signet Bank*, 193 F.3d 818, 827 (4th Cir. 1999). "Concealment of a material fact by one who knows that the other party is acting upon the assumption that the fact does not exist constitutes actionable fraud." *Id.* (quoting *Allen Realty Corp. v. Holbert*, 227 Va. 441, 450, 318 S.E.2d 592, 597 (1984)). Under Virginia law, "unlike fraud for affirmative misrepresentations, concealment requires a showing of intent to conceal a material fact; reckless nondisclosure is not actionable." *Id.* (citing *Norris v. Mitchell*, 225 Va. 235, 240-41, 495 S.E.2d 809, 812 (1998)).

Wenzel identifies two omissions. First, she alleges that the Form S-3 failed to disclose that "the fair market value of the units was not based on appraisal of the Apple REITs' assets or other valuation methodology" and that "the price last paid for a DRIP share by an unrelated person in the context of a non-traded REIT did not reflect a meaningful estimate of the underlying or realizable value of the units." FAC ¶ 36. Second, she alleges that from 2008 until 2011, "Apple REIT management received internal strategic planning analyses … that contradicted the REITs' representations that $11.00 constituted the 'fair market value' of the units as stated in their Form S-3 and the 'estimated market value' of the units as stated in their Forms 10-K." FAC ¶ 39. Even assuming these facts as true, Wenzel fails to allege anywhere in the first amended complaint that the defendants intentionally concealed this information. Without that essential element, Wenzel fails to state a claim for concealment. *See Norris v. Mitchell*, 255 Va. 235, 240-41, 495 S.E.2d 809, 812 (1998) (explaining that concealment requires "either an allegation or evidence of a knowing and deliberate decision not to disclose a material fact").

Moreover, the Court has serious doubts as to whether Wenzel's allegations show an omission at all. The Form's use of "fair market value" is clearly defined when one reads the entire pricing language together: "the most recent price at which an unrelated person has purchased our units." FAC ¶ 35. The inclusion of that definition of "fair market value" necessarily excludes any other. The fact that the Form S-3 does not go into specific detail to explain what "fair market value" does not mean when its definition is so clearly outlined in the Form does not equate to an omission of those negative implications. *Cf.* Antonin Scalia & Bryan A. Garner, *Reading Law* 107 (2012) (explaining that "the principle that specification of the one implies exclusion of the other validly describes how people express themselves and understand

verbal expression"). Besides, one does not need to be a sophisticated investor to understand that the last price paid for an asset simply represents the price someone else was willing to pay. And, with any buyer, from a parent shopping for milk to a hedge fund manager trading in derivatives, sometimes the price one pays does not reflect the absolute value of the underlying asset. Virginia common law (and general common sense) should not require A8 to spell that out to investors or else be liable for concealment. The lack of any such disclaimer is not a material omission in this case.

Accordingly, the Court grants the defendants' motion to dismiss Count IV.[8]

### E. Count V: Negligence and Gross Negligence

Wenzel next says that some of the defendants violated a duty to shareholders "by utilizing and/or allowing A-8 to utilize an $11.00 valuation for DRIP purposes." FAC ¶ 85. But which defendants Wenzel alleges this count against is not entirely clear.

### 1. Proper Defendants Under Count V

The heading for Count V asserts the negligence claim against all of the individual defendants ("Against All Defendants Except Apple Hospitality, Apple Eight Advisors, Inc., And Apple Fund Management, LLC"). The statements that follow, however, describe defendants who "were all engaged by or on behalf of A-8 to provide services that included the management, operation, financial reporting, and calculation of valuation of units, and/or the maintenance of accurate books and records and robust, accurate, and appropriate financial reporting systems." FAC ¶ 83. That statement seems to imply the individual management defendants and the management entity defendants, but not the individual director defendants. *Compare* FAC ¶ 83, *with* FAC ¶ 13 (describing the individual management defendants as "the management team of

---

[8] Because the Court dismisses Count IV on these grounds, it need not decide whether Wenzel's fraud claim is barred by the statute of limitations.

the Apple REITs who formulated the dividend policies, and recommended to directors of A-8 the declaration of dividends and distributions, and recommended the $11.00 valuation to be used to calculate the value of the DRIP shares"); FAC ¶¶ 14-15 (describing A8A and AFM as entities that provided "management services" to A8). Even more confusing, the paragraphs under the heading contain specific allegations against A8A and AFM but not the individual management defendants. *See* FAC ¶ 84 (stating "A8A and AFM were under a duty to shareholders"). It is not at all clear from the first amended complaint against whom Wenzel alleges Count V.

Wenzel asserts in her brief that, although mislabeled in the heading, the allegations within Count V give sufficient notice to A8A and AFM of the negligence claim. Fair enough. *See Labram v. Havel*, 43 F.3d 918, 920 (1995) ("Legal labels characterizing a claim cannot, standing alone, determine whether it fails to meet [Rule 8's] extremely modest standard."). But to the extent Wenzel wishes to pursue Count V against any other defendant, the first amended complaint contains no facts supporting any such claim. The Court grants the defendants' motion to dismiss as to the negligence claims against the individual defendants and Apple Hospitality.

## 2. Negligence Claim

The Court previously dismissed a negligence claim asserted against A8A and AFM from Wenzel's original complaint, which mirrors Count V almost word-for-word. The only change: where the original complaint stated the conclusion that A8A and AFM "were under a duty to shareholders of A-7 and A-8," the first amended complaint adds on, "arising out of the common law of Virginia based upon their undertaking to provide valuation and/or financial advisory services for A-8 and/or the Individual Defendants." FAC ¶ 84. The Court dismissed Wenzel's first pass at negligence for failing "to provide sufficient facts supporting the existence of duty," and this second attempt fails for the same reason.

The existence of a duty is a question of law. *Fox v. Custis*, 236 Va. 69, 74, 372 S.E.2d 373, 375 (1988). For that reason, a complaint alleging negligence cannot simply conclude the existence of a duty in order to satisfy that element of the claim. *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of a cause of action, supported by mere conclusory statements, do not suffice."). The complaint must include factual statements that sufficiently support the existence of the duty that the defendant owed to the plaintiff.

Instead of making a factual statement about the relationship between DRIP participants and A8A and AFM, Wenzel simply adds a legal conclusion: Virginia law says that a party that takes on the valuation services or financial advisory services for a company or its employees owes a duty of care to the company's investors. This statement adds no factual basis to support a negligence claim already dismissed once by this Court.

But even setting aside the rule that a court must ignore legal conclusions on a 12(b)(6) motion to dismiss, *Twombly*, 550 U.S. at 555, Wenzel points to no case that discusses the existence of a duty owed by a company's hired financial advisers to the company's shareholders. Instead, Wenzel argues in her brief that a defendant assumes a duty of care "when it renders services that protect another person's property and its failure to do so increases the risk of harm or causes others' reliance." Pl.'s Brief at 26. This so-called "negligent undertaking" theory comes from the "ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all." *Didato v. Strehler*, 262 Va. 617, 628, 554 S.E.2d 42, 48 (2001) (quoting *Nolde Bros. v. Wray*, 221 Va. 25, 28, 266 S.E.2d 882, 884 (1980)). In other words, Wenzel alleges that as soon as A8 hired A8A and AFM to provide valuation and financial advisory services, A8A and AFM undertook those actions on behalf of the DRIP participants and thus owed the participants a duty of reasonable care.

Wenzel compares her allegation of duty to the duty found in *Khadim v. Laboratory Corporation of America*, 838 F. Supp. 2d 448 (W.D. Va. 2011), a case in which a federal court applied Virginia's negligent undertaking theory by relying on the Supreme Court of Virginia's opinion from *Didato v. Strehler*, 262 Va. 617, 554 S.E.2d 42 (2001). Both cases involved interpretation of Virginia's medical malpractice laws in order to determine whether certain healthcare providers who made errors in diagnosing genetic defects in unborn children owed a duty of care to the children's parents. *Khadim*, 838 F. Supp. 2d at 456; *Didato*, 262 Va. at 627-28, 554 S.E.2d at 47-48. As explained in *Didato* and applied in *Khadim*, a duty of care extended to the parents when the defendant undertook a genetic analysis of the unborn child, because the defendant should have recognized that the parents would rely on the analysis to make decisions about continuing the pregnancy or having children in the future. *Didato*, 262 Va. at 629, 554 S.E.2d at 48; *see Khadim*, 83 F. Supp. 2d at 458-59.

In *Didato* and *Khadim*, unlike here, the defendants rendered services directly to the plaintiffs in the form of genetic testing. Here, the services provided by A8A and AFM were not to Wenzel and her fellow DRIP participants, but directly to A8. In the first amended complaint, Wenzel states that A8A was "the advisor to A-8" and "provide[d] . . . management services *to A-8*." FAC ¶ 14 (emphasis added). She also says that AFM "provide[d] the management services . . . to . . . *AR8*." FAC ¶ 15 (emphasis added). Although Wenzel tries to push the relationship closer to DRIP participants by alleging that the services provided were "for the benefit of the A-8 shareholders," she cannot avoid the fact that A8A and AFM operated "to provide services *to A-8* including services attendant to the DRIP." FAC ¶ 16.

The Supreme Court of Virginia limited the reach of the negligent undertaking doctrine in *Fruiterman v. Granata*, 276 Va. 629, 668 S.E.2d 127 (2008), another medical malpractice case

involving genetic counseling. 276 Va. at 646, 668 S.E.2d at 137. In that case, a husband failed to show sufficient evidence that his interaction with his wife's obstetrician during a medical appointment amounted to an affirmative undertaking by the doctor to provide him with care and treatment. *Id.* As the court explained, negligent entrustment requires a showing that the defendant "personally engage[d] in some *affirmative act* amounting to a rendering of services to another." *Id.* (quoting *Jenkins v. Best*, 250 S.W.3d 680, 693 (Ky. Ct. App. 2007)) (emphasis added).

Here, Wenzel fails to allege any facts showing that A8A or AFM took an affirmative act to render services to the DRIP participants. Although it may be true that A8 created the DRIP for the benefit of shareholders like Wenzel, the fact that A8 hired A8A and AFM to provide services for the DRIP does not automatically give rise to the duty Wenzel asserts.

Wenzel was not an expectant parent, A8A and AFM were not genetic counselors or doctors, and the DRIP was not an unborn child. The negligent entrustment doctrine, as developed by the Supreme Court of Virginia, does not apply to these facts. Wenzel fails to state any facts that support the finding of a duty owed by A8A to AFM and, therefore, fails to state a claim for negligence.

Accordingly, the Court grants the motion to dismiss Count V.[9]

### F. Count VI: Virginia Securites Act Violation

Finally, Wenzel claims that all the defendants, except Apple Hospitality, violated the Virginia Securities Act by making misleading filings. FAC ¶¶ 87-91. For many reasons, this claim meets the same fate as its cohorts.

---

[9] Because the Court dismisses Count V on this ground, it need not address whether Wenzel's claims would also be barred by the so-called economic-loss rule.

First, Count VI alleges a violation of Virginia Code § 13.1-516, which prohibits misleading statements "in any document filed with the [Virginia State Corporation] Commission or in any proceeding under" the Virginia Securities Act. Va. Code § 13.1-516. The first amended complaint mentions neither the Virginia State Corporation Commission nor any filings made under the Virginia Securities Act. On this basis alone, Count VI fails to state a claim.

After the defendants pointed out this defect, Wenzel conceded that she provided the wrong statutory section for Count VI; instead she meant to allege a claim under Virginia Code § 13.1-522(A)(ii), which provides a cause of action for investors who buy securities based on false statements or omissions of material facts. Pl.'s Brief at 28. Just like her mislabeling of the defendants in Count V, Wenzel argues that the defendants had sufficient notice that *this* was the applicable cause of action under Count VI. The Court notes, however, that mislabeling defendants in a negligence claim greatly differs from asserting the wrong cause of action. Rule 8 allows a court to see through the errors of a complaint by finding the appropriate cause of action from the facts alleged. *See, e.g., Labram*, 43 F.3d at 920-21 (finding that the facts alleged clearly attempted to state a claim for common-law battery despite the label of "sexual molestation"). But if a cause of action derives from a specific statute, the plaintiff cites and quotes the statute, and the defendant rightly points out that the plaintiff's chosen statute does not apply, a court should hesitate to allow the plaintiff to rewrite his complaint through his brief. Otherwise, legal gamesmanship can be made to look like feigned carelessness.

Here, allowing Wenzel leave to amend her complaint to allege a violation of § 522(A)(ii) would be an unnecessary and fruitless waste of resources, because she fails to state a claim under § 522, too. Section 522 assigns civil liability on

> [a]ny person who ... (ii) sells a security by means of an untrue statement of a material fact or any omission to state a material fact necessary in order to make

the statement made, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission.

Va. Code § 13.1-522(A). The statute necessarily requires the sale of a security "by means of an untrue statement of material fact" or an omission of material fact. *Id.* § 13.1-522(A)(ii). These allegations must meet the heightened pleading standard of Rule 9(b). *See Dunn*, 369 F.3d at 426 (recognizing Rule 9(b)'s applicability to fraud claims brought under the Virginia Securities Act). As discussed above with respect to Count IV, Wenzel's allegations fail to state a claim for fraud.

Accordingly, the Court grants the defendants' motion to dismiss Count VI. [10]

## III. CONCLUSION

Wenzel's first amended complaint convinces the Court that A8's DRIP may have been a bad investment for a variety of reasons, but it lacks sufficient facts to support the claims it alleges. For the reasons discussed above, the Court dismisses the first amended complaint.

The Court will enter an appropriate order.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: <u>June 1, 2015</u>
Richmond, Virginia

/s/
John A. Gibney, Jr.
United States District Judge

---

[10] Just as with Count IV, because the Court dismisses Count VI on this basis, it need not decide whether Count VI is barred by the statute of limitations.